INTERNATIONAL PATENTS DEVELOP-
MENT CO. et al. v. PENICK & FORD,
Limited, Inc.

No. 654.

District Court, D. Delaware.
July 30, 1936.

Melville Church, of Washington, D. C., Percival H. Truman (of Barnett & Truman), of Chicago, Ill., and Hastings, Stockly & Duffy, of Wilmington, Del., for plaintiffs.

John H. Lee and Horace Dawson (of Dyrenforth, Lee, Chritton & Wiles), both of Chicago, Ill., and William G. Mahaffy, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a patent suit charging defendant with infringement of three patents for the production of grape sugar. Grape sugar, corn sugar, dextrose, and dextrose hydrate are terms used interchangeably to describe the product of the patents. The defenses are invalidity, noninfringement, license, and estoppel.

The first patent, No. 1,471,347, granted October 23, 1923, to William B. Newkirk, assignor to Corn Products Refining Company, for a "Method of Making Grape Sugar," is a process patent. The second patent, No. 1,508,569, dated September 16, 1924, to Newkirk, assignor to Corn Products Refining Company for "Grape Sugar," is a product patent. The application for this patent is a division of the application for the first patent. The third patent, No. 1,521,830, granted January 6, 1925, to Newkirk, assignor to International Patents Development Company, for the "Manufacture of Dextrose," covers an improvement on the process of the first patent.

The plaintiff International Patents Development Company is owner of the three patents. The plaintiff Corn Products Refining Company has a license from International Patents Development Company to manufacture and sell dextrose under the patents. This is an exclusive license except for a nonexclusive license to American Maize Products Company. Corn Products Refining Company has a factory at Edgewater, N. J., where the patents were developed in the first instance. It also has a larger factory at Argo, Ill., where the process was further developed and where it is now practiced on a large scale. The defendant Penick & Ford, Limited, Incorporated, has a factory at Cedar Rapids, Iowa, and is engaged in the production of various corn products.

Dextrose is a sugar found in nature in the juices of certain fruits like grapes. The real source of the raw material is cornstarch. Dextrose is manufactured by converting cornstarch. The method of conversion is to put the starch mixed with water and a small amount of hydrochloric acid into a large vessel. Heat is then applied and the starch is changed into sugar. In reality, the starch molecule is split and takes up water. It is a process of hydrolysis. The process is to bring about crystallization of the dextrose and then separation of the crystals from the mother liquor or hydrol. Dextrose differs from cane sugar. Cane sugar or sucrose is an anhydrous sugar. The crystal contains no water of crystallization. The natural form of sucrose is a rough cubicle crystal of fairly good size not grown together. On the other hand, dextrose crystallizes into two forms that are quite different. In one form the crystal is anhydrous. In the other form the crystal takes up water from the solution and is known as dextrose hydrate. The water goes into the molecular structure of the crystal sugar and forms part thereof. The anhydride and hydrate are in different crystal systems.

The product of these patents is hydrate crystals known as cerelose. The hydrate crystals are white, of high purity, and granular. Their tendency is to grow together in clusters and intertwine into a rather solid mass. In the Newkirk process the form of the crystal is of the utmost importance. It aims at relatively large crystals. The process relies exclusively on crystallizing the dextrose so that impurities may be purged from the solid dextrose in the ordinary centrifuge. Cerelose has a purity very close to 100 per cent. It does not compete with corn sugars containing from 5 to 10 per cent. of impurities for which there has been a market for a hundred years. Cerelose competes with sucrose. In some respects it is not as good as sucrose and in others it is better. Being less sweet, it is used to advantage in ice cream, candy, and preserves where undue sweetness is undesirable.

The hydrate dextrose or cerelose crystal is rather flat instead of cubicle. It has higher osmatic pressure, so that it has an advantage over sucrose in preserving. It will penetrate the cells of bacteria and destroy them.

## History of the Art.

In 1811 there was a shortage of cane sugar in Europe as the result of Napoleon's continental system of shutting off England from trading on the continent. A Russian chemist named Kirchoff discovered that you could treat cornstarch with an acid and heat and produce a sugarlike substance called dextrose. He perfected two types. One was slab sugar made by pouring converted liquor into pans and letting it solidify. This sugar contained all of the impurities of the original liquor. It is still made, and is called 70 or 80 slab sugar. Kirchoff also suggested the purification of slab sugar by subjecting it

to pressure. This process is used at the present day, and is what we call Argo sugar. When the big Argo factory of plaintiff was built between 1907 and 1911, it was decided to put this pressed sugar process in as well as the 70 and 80 slab process.

Between 1860 and 1870 what was known as the Anthon process was experimented with but was never used commercially. It was a quiescent crystallization process like the slab sugar and pressed sugar, although the Anthon process contemplated a stirring of the seed. The massecuite was allowed to crystallize quiescently. Where you have a quiescent crystallization of dextrose, the crystals are fine needles which grow in clusters, so it is impossible to satisfactorily purge out the mother liquor. Anthon was never a successful process.

The next step was taken by Becke. He was a crystallographer and not a manufacturer. The hydrate crystals which he actually saw were clustered. However, in his first work he represented in Fig. 7 of one of the articles what he supposed would be a single crystal if it could be produced. The representation of a single hydrate crystal in the first Becke article was an idealization or a hypothetical construction. Afterwards he discovered that the dextrose crystal was hemimorphic and pictured the aspect he saw.

The first real advance following Kirchoff was made by Behr. He was a brilliant chemist and sugar technologist in the employ of one of the predecessors of Corn Products Refining Company. He discovered that he could produce a fairly purgeable massecuite provided he controlled conditions so as to produce anhydrous crystals. The anhydrous crystal is naturally a better crystal to purge than the hydrate crystal. Behr was insistent that the only way to obtain a dextrose of any high purity was to follow the principle of anhydrous crystallization. It is quite a complicated process, but he finally got cakes of anhydrous sugar, and these were put into a centrifugal machine and the mother liquor was taken out so that he got a purity of about 96. In order to get 98, it was necessary to take that sugar, melt and recrystallize it. When Argo was built in 1907 to 1910 or 1911, it was a question as to whether they would put into that factory the Behr process or the pressed sugar process. The expense of the Behr process was so considerable that it was decided to put in the pressed sugar process.

There is no proof that the Soxhlet process was ever commercialized. It has been relied upon as an anticipation. It involves a quiescent crystallization. It does not involve the use of seed and contains no specification of purity. Defendant has developed a surprising theory respecting it. Because the Soxhlet process cannot be operated successfully without crystallization in motion, defendants say it is necessary to read crystallization in motion into the patent. Soxhlet specifies maintaining the temperature of the massecuite at a certain point and defendant's expert says you cannot do that without agitation, therefore he reads agitation into the patent. At the time Soxhlet made his experiments, all of the successful processes were quiescent crystallization processes. There is no presumption that crystallization in motion was contemplated at all. Soxhlet was a laboratory man. There is no proof that the process was ever commercialized, and whether it worked we do not know. You cannot constitute a patent an anticipation by reading into it whatever is necessary to make an anticipation. If that were the rule, no patents would be upheld. This Soxhlet patent came out in 1886. It was assigned to the president of a large glucose company in this country, a predecessor of Corn Products Refining Company. Soxhlet did not get separate individual crystals but clusters.

Up to 1886 we find all of the processes involved quiescent crystallization. We find the only successful process was this Behr process involving anhydrous crystallization. So far there has been no suggestion of anything like crystallization in motion, although the crystallizer had been used in the sucrose art for many years.

Next we come to Wagner and his experiments. He proposed to modify the Behr method of anhydrous quiescent crystallization by substituting a crystallization in the ordinary sucrose crystallizer. He was the general superintendent of the Glucose Sugar Refining Company, one of the predecessors of the plaintiff, and had every reason to make his process succeed. He had the help of three efficient men— Bauer, Sovereign, and Singer. Singer is not connected with the plaintiff or defendant, and states that all the Wagner processes and experiments failed and no merchantable sugar was produced.

The Wagner patent is for an anhydrous process. All evidence the defendant has introduced indicates the manufacture of anhydrous sugar. Wagner made this very clear in his correspondence with the Patent Office. There was a patent to Vernizel cited against Wagner. Wagner replied as follows: "The Vernizel patent refers to a hydrated grape sugar containing 9 to 11 per cent of water of crystallization while Dr. Wagner's patent refers to Anhydrous or waterfree grape sugar. These two bodies are both scientifically and commercially of a distinct type." It was a settled conviction of the industry that the only way of making a pure sugar was by adopting anhydrous crystallization because anhydrous crystals were of a better form to purge. Wagner did not conceive of the possibility of making hydrate sugar. His patent states that it is an improvement on the Behr patent. Behr had made anhydrous sugar by quiescent crystallization, and Wagner wanted to make anhydrous sugar by means of crystallization in motion. As superintendent of a refining company, Wagner realized that, if he could produce a sugar purer than Behr's or by a process less expensive, he would have an enormous field. His experiments lasted over four years. None of the Wagner sugar was ever sold, and the Wagner process was given up. The Wagner period of experimentation covered a period from 1902 to 1906. The refining company continued to practice the Behr process for five years after the Wagner idea was dead and buried. Everything of importance in the Wagner patent is indefinite. He does not give any density. He suggests cooling the liquor down to a temperature between 100° and 130° and he does not state what the important temperature is. The whole patent is vague. The reason it did not succeed was because Wagner did not have a sufficient knowledge of the crystal habit of dextrose to make the thing work. Wagner testified that, while he was trying to get anhydrous, his massecuite contained some of the hydrate. Here is an explanation. You cannot purge mixed masses. The last we hear of Wagner was in 1907. There was no further development in the art until Newkirk.

For a long time laboratories turned out chemically pure dextrose in small quantities. As far back as 1903, plaintiff made its own C. P. dextrose. Since 1913 the Bureau of Standards has been producing in small quantities a C. P. dextrose. It is an anhydrous sugar, and has all its characteristics, although it is hydrate at an intermediate stage of manufacture. The process consists of some 25 refining operations carried out with the use of alcohol as a solvent. When the Bureau got their material down so that it contained about 1 per cent. of impurities, they crystallized it repeatedly until they got a product that was chemically pure. They did not pay any attention to the form of the crystal. The fact that it was hydrate at a certain stage was purely accidental. By repeated operations and by means of a solvent they tried to "leach" out all impurities. As a matter of fact, what they did was to put the liquor into a bottle. The bottle was revolved in a shaking machine at a high rate of speed. The purpose was to obtain as small crystals as possible. The product which they finally got was a hydrate, but at no stage of the process did they have a massecuite of separate individual crystals. Comparing the Bureau of Standards process with Newkirk, there are certain fundamental differences. The Bureau of Standards process relied upon the solvent effect of alcohol and paid no attention to the crystal forms. Their process consisted of a whole series of steps and was very costly. The Newkirk process was the development by a single crystallizing operation and by a single purging operation of purgeable crystals out of the converted liquor.

There was put in evidence a product made incidentally in the bureau of standards by Dr. Jackson in 1913 known as "fraction 8." These crystals could not be purged out of the viscous liquor such as plaintiff has. They are long, lathlike and very thin crystals. Obviously they are not the chunky crystal required by the Newkirk process. This evidence is of no importance because there was no analysis of the product and no determination of its crystal characteristics until after this litigation was started.

### Newkirk.

The form of the crystal was a matter of the utmost importance in the Newkirk process. Newkirk's idea was to produce such a form of crystal that it could be purged from the viscous mother liquor in which it was developed without the use of a solvent. It had to be worked out so that the sugar could be produced and sold

1042

at 3 or 4 cents a pound in competition with high grade sucrose.

The Behr process was the high-water mark in the industry to 1913. By that time the Behr process had been abandoned. While it got a fairly high purity of 96, it was expensive in comparison with the pressed sugar process which gave a purity of 94 or 95. At the time Newkirk started his experiments, the only dextrose sugar products on the market were the 70 and 80 sugar and the Argo sugar. The Behr process was then a matter of history. The successful processes involved quiescent crystallization. The only hydrate crystals known at that time were the unpurgeable clusters and flakes.

In 1918 Porst was research chemist of the plaintiff at Edgewater Laboratory. A demand had developed for high purity C. P. dextrose for medical uses. Porst started out to improve the process of making C. P. dextrose. His theory was a quiescent crystallization of an already prepared sugar. He finally produced a product which the company could afford to sell from $2 to $5 a pound. This suggested to Porst the possibility of crystallizing directly from the converted liquor in a crystallizer. His first experiment was in March, 1919. He had come in contact with the Bureau of Standards. He was of a scientific turn of mind, and liked to talk things over with members of the Bureau. While he was engaged in this second line of experimentation of the attempted production of dextrose of a fairly high purity directly from the converted liquor by the use of a crystallizer, he met Newkirk.

Newkirk was then a sugar chemist and technologist. Before the war he had been in the employ of several beet sugar and cane sugar companies in this country and in Cuba. When the United States entered the war, Newkirk tried to enlist, but he was held in the sugar industry because it was considered a necessary industry. In the latter part of 1918, after the Armistice, but before the war was really over, Newkirk was drafted into the Bureau of Standards. He became thoroughly familiar with the process at the Bureau of making C. P. dextrose, although his job was making alcohol Manite.

Newkirk met Porst within three months after he went to the Bureau. Porst wanted some help from Newkirk because Newkirk was an expert in sucrose. An arrangement was made by which Newkirk should go to Edgewater and help Porst. Beginning June, 1919, there were a series of experiments during that year. Some gave fairly good results, others were complete failures. The experiment stressed in the testimony is the Edgewater experiment of June 19, 1919. The apparatus at Edgewater was not adequate. There was no granulator and no method of washing the purged material. Newkirk crystallized some sugar and brought back to the Bureau a block which he showed to Bates. There was no determination at the time of the crystallized character of the sugar. Later, when analyzed, it had a purity of about 95. This block consists largely of hydrate dextrose. Newkirk testified that he knew the difference between anhydrous and hydrate at that time and that when he made it it was anhydrous. His theory is that the block contained enough water so that the anhydrous sugar changed in part to hydrate. The fact is that every one at the time thought it was anhydrous. There was no analysis to determine its character until long after the Newkirk patent had issued and this litigation started. This was Newkirk's first experiment, and the whole matter is of no importance. The product was not a finished sugar, and was neither used nor sold. Newkirk and Porst co-operated in a number of other experiments. They were trying to make anhydrous sugar. Newkirk was not aiming so much at purity. He was trying to get a process better than the existing process.

When his war duties were over, Newkirk was glad to get out of the Bureau. Plaintiff agreed to hire Newkirk to improve its processes. In April, 1920, he resigned from the Bureau and joined the staff of the plaintiff at Edgewater. When Newkirk got to Edgewater, he devoted his first two months to a study of the literature and of the old processes. In July, 1920, he began his experimental work. He carried out experiments independently of Porst and on his own responsibility.

Newkirk in his experiments tried all of the sugar practices. He tried the vacuum pan crystallization and was not successful. He tried graining in the vacuum pan and finishing in the crystallizer and was not successful. What he had to do was to take the machinery of the sucrose art, the crystallizer, and make that his principal instrumentality for crystallization. He devised a control for that instrumentality which was entirely foreign to any-

thing in the sucrose art. He completed the matter by his use of foots as a control factor.

There are advantages in the making of hydrate sugar over anhydrous, as the hydrate tends to come out at the lower temperature. You can carry your temperatures down in making the hydrate and therefore get a larger yield. The lowering of your temperature brings about increased supersaturation, and that results in increased crystallization. In making the anhydrous crystallizing in motion you have to stay above certain temperatures, and that means your yields are proportionately decreased. Another of the disadvantages in manufacturing anhydrous is that it cannot be manufactured in a factory where you are manufacturing hydrate by the process of crystallization in motion. All of the sugar factories are making the pressed sugar or slab sugar, and you have the air filled with hydrate sugar dust. You are beating the hydrate sugar into your crystallizer and seeding the crystallizer with hydrate seed. All efforts which have been made to produce anhydrous sugar by crystallization in motion in an atmosphere laden with hydrate seed have proved failures. Newkirk in carrying out his process ran counter to every settled conviction in the art. He produced the hydrate where the settled conviction in the art was that the process lay in the other direction.

There was no granulator or proper drying apparatus. In March, 1921, they installed a granulator at Edgewater and then the first finished sugar was made. This was anhydrous sugar. May 5, 1921, the first batch was sent to the Beech Nut Packing Company and was rejected because the quality was not good. The first regular sales began in November, 1921. At Edgewater Newkirk made about 50,000 pounds of anhydrous.

In his experiments he observed on September 13, 1920, probably accidentally and for the first time, hydrate crystals entirely different from the hydrate crystals in clusters that he had been accustomed to see in 70 sugar.

In his experiments he realized he would have to make some use of hydrol. He started to make hydrate from the hydrol. He experienced a great deal of difficulty in making anhydrous sugar due to the fact that the air was filled with hydrate seed from the slab sugar process. Finally he obtained permission to give up the process of making anhydrous and to make the hydrate alone. Newkirk says it took a lot of courage to make that recommendation, because everybody in the industry told him that in making pure sugar he would have to make anhydrous. Newkirk changed the process, reduced his gravities and temperature, and operated the hydrate process outlined in the first patent. Under that process he turned out millions of pounds of hydrate sugar which were sold.

Newkirk still had difficulties, particularly in the matter of close supervision. In 1922 and the early part of 1923 Newkirk carried on hundreds of experiments varying his conditions in order to obtain, if possible, a process requiring less supervision. He conceived the idea that the amount of seed might exercise a controlling influence on his crystallization. He made a lot of experiments, first, to determine whether the use of a large amount of seed affected control, and, second, to determine what was the best amount to use. He finally hit upon the idea of the second patent.

An experimental plant was then being planned for Argo. Building 47 at Argo was erected as a compromise between Newkirk and the executives of plaintiff. They put into building 47 sixteen crystallizers and started operations in November, 1921. In 1923 building 48 was being erected at Argo. By the time building 48 was put into operation, his process was standardized as to temperatures, densities, and amount of seed. The amount of seed was ultimately fixed at 30 per cent. of foots containing about 50 per cent. of solid phase. Plaintiffs' process thus standardized in 1923 has never been changed in any material respect.

In 1922 plaintiffs' production amounted to about 8,000,000 pounds. The following year 20,000,000 pounds were sold. In 1924 40,000,000 pounds. The present output is in the neighborhood of 100,000,-000 pounds. Defendant's capacity is about 75,000 pounds a day and for a 300-day year 22,000,000 pounds. American Maize Products Company, a licensee under these patents, is licensed to make 6,000,000 pounds per year.

Before Newkirk, high purity dextrose was rare. It was manufactured in small amounts by complicated and expensive processes in laboratories at prices varying from $12 to $2 per pound. The Bureau

1044

of Standards manufactured a high purity dextrose or C. P. dextrose and sold it at $2 to $13 a pound at a loss. The laboratory products were all anhydrous. Plaintiffs' cerelose or dextrose hydrate sells at 3¼ to 6 cents per pound.

### Newkirk Patents.

Typical claims of the Newkirk patents are cited in the footnote [1]. Briefly, the Newkirk process may be outlined as follows. The liquor, after it has been concentrated in the vacuum pan to reduce its density, is put into a crystallizer which has in it a slow moving agitator. The novelty of the invention has to do, among other things, with the application of the proper temperatures of the liquor and proper density and purity of the massecuite. The temperature is properly controlled so that one obtains the hydrate product. You have then a rather thick mass of crystals that are put into a centrifugal machine, and, if the crystals are of proper form and size, the mother liquor will be thrown out through the interstices of the crystals of the mass. Thereafter water is introduced into the centrifugal machine and the last traces of impurities are washed out. Everything depends upon having a purgeable massecuite.

 The first patent has been attacked on the ground that it contains erroneous teachings. The attack is based upon a misapprehension of the law. Newkirk operated under his first process for about a year. He turned out millions of pounds of hydrate sugar. It was the best prescription that Newkirk then knew. If the specification of the first patent contains statements that are erroneous, they would invalidate the patent only if it could be proved conclusively that they were introduced for the purpose of deceiving the public. The statute which governs this matter is section 4920, Rev.St. (35 U.S. C.A. § 69), which provides that the patent shall be voidable if "for the purpose of deceiving the public the description and specification * * * was made to contain less than the whole truth relative to his invention or discovery, or more than is necessary to produce the desired effect." There has been a great deal of evidence as to this so-called bad teaching. If all those statements were true, it would not in the slightest affect the validity of the patent.

Specifically the bad teaching is as follows: (1) The defendant argues that, when the patent mentions a density range of 38° to 45° baume, it means that you can manufacture hydrate sugar from a liquor of any purity anywhere within this range. The patent does not say so. There has been evidence that it is impossible to make the hydrate at the upper part of this range. Newkirk, testifying as defendant's witness, said that he successfully made hydrate sugar up to 45° baume. He did not use high purity liquor. (2) Claim 21 contains no numerical temperatures or densities. The statement as to density means simply that you take a 40° baume liquor and reduce it to a certain temperature in a crystallizer and you get a good product. If you want to use a higher density, you must use a higher temperature; for a lower density you must use a lower temperature. (3) There has been a great deal of evidence based upon the description of the anhydrous process in the first patent. We have no concern with this process. If this patent said you can make anhydrous sugar out of green cheese, it would not affect the validity of the claims as to the hydrate process. (4) The next ground of attack is that holding the massecuite at a temperature to which it is cooled means that you cool it down to a particular tem-

[1] Claim 21, Patent No. 1,471,347:
"The process of obtaining a hydrate crystalline grape sugar from a dextrose solution produced by the conversion of starch, which comprises concentrating the converted solution to a density, and artificially cooling the same down to a temperature favorable to the formation of hydrate crystals and holding the solution at said temperature in the presence of previously formed hydrate dextrose crystals and agitating the magma to keep the same in slow motion during crystallization."
Claim 2, Patent No. 1,508,569:
"Starch converted dextrose having a purity of ninety-nine per cent. or greater and consisting of a mass of separate, unitary crystals of normal crystalline form substantially unmixed with deformed crystals of the needle like or flake like kind."
Claim 3, Patent No. 1,521,830:
"Method of making dextrose from a starch converted dextrose solution which consists in concentrating the solution by heating, cooling the solution to supersaturation without substantial induction of crystals and adding to the solution solid phase dextrose in a quantity and at a temperature to initiate crystallization."

perature and keep it at that temperature. Defendant's expert shows that there may be a difference of 5° in different parts of the crystallizer. What patentee meant was no substantial reduction of temperature. If all these accusations against the teaching of the first patent were sound, they would not affect the validity of the patent, because the patent gives a prescription admittedly correct, and that is all the statute requires.

The massecuite left in the bottom of the crystallizer is called foots. Hydrate crystals are formed below 120° and anhydrous are formed above 120°. You must produce a massecuite with one type of crystal or the other. Conditions are wholly different in crystallizing sucrose where you have a good chunky crystal that does not cluster and that is alway anhydrous. Newkirk's problem was to provide a formula control so that he could make a purgeable massecuite.

We have in the third patent two improvements. One is the use of a large amount of seed so that it will be a significant and controlling factor. The other' is the practice of cooling the liquor before it is introduced into the crystallizer in a separate cooling vessel. Newkirk found when he used a large amount of seed it was desirable to use the cooler. He introduced the precooled liquor into contact with the seed and obtained a better control. He knew definitely what his liquor temperature was. He knew the temperature of his foots. He knew the quantity of seed. In this way he got control of induction which was a great improvement upon the process of the first patent.

Newkirk stated the advantages which he obtained in the second process patent over the first. The old process required an expert in order to carry out crystallization. The second process was practically automatic, so that it could be carried out by a person of ordinary intelligence. Newkirk testified: "For example, in the early days, when we were working on this first patent, we had one man who took care of 16 crystallizers. * * * The operating foreman of the Crystallizing Department visited the crystallizer floor every four hours to see that this sugar boiler that we had on the floor was doing the job. I am now controlling 160 crystallizers spread over three floors and the man who does the control of the crystallizers is the house foreman and he visits the crystallizers once a day in the morning. * * * They are pumped in by a low priced laborer, and they are emptied by a low priced laborer. One man does the filling and sweeping and turning on the water and all the rest of it on these three floors containing 160 crystallizers."

Defendant has introduced a series of reports of a large number of ex parte experiments carried on for the purpose of showing that the old prior art patents could be worked satisfactorily and to show that the Newkirk patent was inoperable. Defendant operated the Williams patent not heretofore mentioned. It was a slab sugar patent. It was not intended to give a purity higher than 89 or 90, yet according to defendant's report it gave a purity of 99.7 and a commercial yield of 20 to 25 per cent. Defendant operated the Soxhlet patent without seed and without motion. Defendant's expert says that he got purgeable massecuite with a purity of 99.7 and a commercial yield of 20 to 25 per cent. Defendant operated the Behr process and got purities ranging from 97.4 to 99.4. This would have surprised Behr, because he did not succeed in getting anything higher than 96.

The question suggests itself. If this defendant can operate the Anthon process or the Williams process or the Soxhlet process and get hydrate sugar of purity more than 99½, why does it not adopt one of these old prior art processes? Defendant operated what was called the Wagner experiment and got a purgeable massecuite with a purity of 98.9. Defendant operated the Newkirk patent and found: "The experiment was a failure. The massecuite is unpurgeable."

The best answer to the above is a quotation from Bemis v. Charles A. Stevens & Bros. (C.C.) 177 F. 717: "I give no weight to complainants' experiments made in the absence of defendants. Such attempts at making evidence are not to be encouraged." It is rather interesting that the Wagner experiments were all made to work, although Wagner after years of struggle was unable to make them work.

It should be remembered that practically all the prior art patents relied upon by defendant were considered by the Patent Office. Not only that, but most of these patents, the Wagner, Soxhlet, and Williams patents, were brought into the case by Newkirk.

1046

### Infringement.

Defendant's product is admitted to be hydrate. It is admitted to be 99.5 per cent. pure or better. The crystal is chunky. The fact that the crystals are more or less stuck together in the masseuite does not change their character as separate individual crystals.

■ The principal defense against the product patent is that it is a product of nature. The product of Newkirk is not a product of nature. It is an artificial product. It is made by the conversion of starch through a chemical process by artificially adding water to the starch molecule. You do not find anywhere in nature a separate hydrate crystal because you do not find the crystallization process at work in nature.

There are a number of analogous products, the patentability of which has been sustained. In the Masonite Case the product consisted of all the ingredients of wood or woody material. The product claim was sustained by the Court of Appeals. Masonite Corp. v. Celotex (C.C.A.) 66 F.(2d) 451. The product consisted of nothing but a physical arrangement of woody ingredients in closer contact than they would be in natural wood. A patent was sustained for granulated burned dolomite. Also a patent has been held valid for calcium carbide, aspirin, adrenalin, and baking powder.

■ Defendant's product consists of crystals of the normal Newkirk type as described and claimed in Newkirk patent 1,508,569. Claims 3 and 4 of this patent are infringed.

■ The first process patent has been attacked on the ground of inoperativeness because of the method of cooling. Defendant's experts argued that the use of cold water was bad practice and produced too high supersaturation. In response, Newkirk testified there were several million pounds made under his first patent. Defendant called Newkirk as a witness. He testified in part as to his anhydrous process. The answer of Newkirk quoted in defendant's brief refers to the anhydrous process.

■ The first patent is also attacked on the ground that it contains new matter. The new matter is supposed to be crystallization in motion. At the time of the first patent there were two methods of crystallization, quiescent crystallization and crystallization in motion. Crystallization in motion was well known and established in the sucrose art. It had been attempted to be brought into the dextrose art by the Wagner patent. It was not necessary in this patent to more than briefly refer to the fact that Newkirk was using the sucrose crystallizer with its agitator.

■ The first patent is also attacked on the ground that the disclaimer is invalid. Two grounds are alleged. One is that there was a change made in the invention by the disclaimer. The other is that the disclaimer was filed too late. Newkirk expressed the opinion that the disclaimer was made to avoid the Soxhlet patent. That was not correct. The claim as it stood differentiated from Soxhlet, and the Soxhlet patent was before the Patent Office when the Newkirk application was pending. The invention involving crystallization in motion was an essential feature, and to avoid criticism that element was specifically put in the claim.

Proof of defendant's process appears from two different sources for two different periods. The first period covers February to September, 1925. During this period the defendant used 27.7 per cent. of foots. That is 36″ of foots in the bottom of a B-sized crystallizer. Defendant admits that during this period the foots contained 6.1 per cent. of solid phase. The use of that amount of foots and solid phase would constitute an infringement of the patent. However, defendant construes the patent as limited to a minimum of 8 per cent. of solid phase. 6.1 per cent. of solid phase which defendant admits using from February to September, 1925, is on the basis that the foots contained only 22 per cent. of solid phase. The evidence is that plaintiffs' solid phase is about 50 per cent. or 55 per cent. of the foots, and defendant admits that under their present process the solid phase in their foots is 37 per cent. When plaintiffs called for the records, it was told there were none. Plaintiffs' expert carried out the defendant's process at Argo. He came to the conclusion that the figure was about 34 per cent. of solid phase instead of 22 per cent.

The court required the defendant to produce its records for the period subsequent to the filing of the bill of complaint, and those records contain spinning tests from February, 1929, to February, 1930. They showed a percentage of 32.2 per cent. of solid phase.

The court finds that, before the filing of the bill of complaint, the solid phase of defendant, instead of being 6.1 per cent., was in the neighborhood of 9 per cent. This brings defendant's process within the second patent.

Defendant's expert went on the stand, and, without any explanation as to the statements made under oath in his deposition, repudiated his deposition and stated that the books, while showing 36″ and 28″, did not mean that. He testified these figures stood for other figures according to an intricate method of computation. He stated there were certain advantages in putting the foots in on top of the liquor rather than leaving them in the bottom of the crystallizer. After filing the bill of complaint, this practice, which was better than the other practice, was entirely abandoned according to defendant's testimony, and from then on they left foots in the bottom of the crystallizer.

What is the effect of keeping records in this extraordinary way? 36″ of foots would never mean 36″ of foots. It might mean, according to this top seeding theory, 25″ at the bottom or 21″ down from a point 6″ below the top. The reasons for rejecting this top seeding theory are (1) defendant's expert in his deposition has said exactly the contrary, and (2) you cannot keep records in this way in any factory. Whenever you made a change in the amount of inches of foots, you would have to go through intricate calculations to find out what would be the equivalent in space above the liquid on the top seeding theory of operation. It would appear that the top seeding story was an expedient for the purpose of this suit and was used by defendant to conceal its process and to deceive the plaintiff.

██ Defendant began manufacturing "cerelose" after both Newkirk patents had issued. From December 7, 1925, to May 28, 1927, defendant's manufacture of high purity dextrose was in accordance with the operating data of tables I and II to VII (Plaintiffs' Exhibits 57 and 58 as modified by table I–A, Plaintiffs' Exhibit 83). Defendant's process as practiced prior to the bill of complaint was an infringement of claims 13, 14, 16, 21, and 24 of the first process patent. Defendant's admitted practice of modification No. 1 was an infringement of claims 13, 14, 16, 21, and 24 of this patent. Defendant's process during the period covered by Plaintiffs' Exhibit 57, table 1, and Plaintiffs' Exhibit 83, table I–A, was an infringement of claims 13, 14, 16, 21, and 24 of this patent.

██ From February 1, 1925, to December 6, 1925, the period before defendant's available logbook records, defendant used 36″ of foots in the bottom of a B-sized crystallizer. In other words, defendant used 27.7 per cent. of foots on the batch with a crystallizing temperature of about 105° F., and densities of about 39.5° baume. During this period defendant infringed claims 4, 10, 15, 17, 19, 20, and 29 of the second process patent.

From December 7, 1925, to May 29, 1927, Plaintiffs' Exhibit 57, table I, as modified by Plaintiffs' Exhibit 83–a, table I–A, contains a correct transcript of the inches of foots appearing on defendant's books. The corresponding percentages of foots given in Plaintiffs' Exhibit 57, table I, as modified by Plaintiffs' Exhibit 83, are correctly computed from the inches of foots as given in these exhibits in accordance with the explanations and descriptions given in the deposition of defendant's expert and in accordance with the charts (Plaintiffs' Exhibits 1 and 2) produced and explained by defendant's expert in connection with his deposition.

The percentage of foots given in Plaintiffs' Exhibit 57, and not the percentages given in the so-called "corrections" to Plaintiffs' Exhibit 57, contained in Defendant's Exhibit 55, represent the percentage of foots based on the filled crystallizers used by defendant from December 7, 1925, to May 28, 1927. The percentage of solid phase in foots in defendant's process during this period was about 32 per cent. to 34 per cent. During a part of the period from February 25 to July 27 defendant admittedly used 36″ of foots in a B crystallizer. In other words, 27.7 per cent. containing solid phase as seed in quantities of at least 6.1 per cent. of the material in the crystallizer. During this period defendant used solid phase as seed ordinarily in the form of foots in such quantities that the solid phase was a significant factor in controlling crystallization. During this period, and also during the period subsequent to filing the bill of complaint, defendant increased the effectiveness of control by the solid phase used through its method of incremental filling. During a part of this period defendant used solid phase as seed in quantities of at least 12.2 per cent. of the first charge of liquor brought into contact with the foots under defendant's incremental filling meth-

1048

od. During the period December 7, 1925, to May 28, 1927, defendant used on the average about 8.9 per cent. solid phase based on the whole batch in the crystallizer. Defendant's practice prior to the filing of the bill of complaint constituted an infringement of claims 4, 10, 15, 17, 19, 20 and 29 of the second process patent.

### License and Estoppel.

In 1926 Congress was considering corn sugar legislation. This brought together G. M. Moffett, president of plaintiff, and F. T. Bedford, president of defendant. Some suggestion or discussion of the Newkirk process occurred. Bedford testified it was understood that defendant was to be given a license to make sugar by a single crystallization operation under the Newkirk patents without royalty or other consideration, and that a written license agreement should be drawn up and executed satisfactory to the parties. As corroborative, Bedford produced a letter written to Price, an officer of the defendant, embodying his understanding, although there is no evidence that Moffett or any representative of the plaintiff ever saw the letter until it was produced in court. In any event, plaintiff tendered defendant a license agreement similar to the license between the plaintiffs and American Maize Products Company. Defendant declined to sign it. Moffett testified that this tender on his part was in accordance with the understanding at the conference between the parties on March 18, 1926.

It is certain that Moffett in any negotiation with Bedford had no authority to bind the corporate plaintiffs or either of them. At most Moffett was merely acting as a negotiator subject to ratification by his corporate principals until the contemplated written agreement was prepared. There is no evidence that Moffett in his conversations with Bedford had authority from International Patents Development Company, owner of the legal title to the patents, to grant licenses under the patents to defendant. It is equally certain that defendant at no time tendered to plaintiffs or either of them any license agreement embodying Bedford's understanding. Probably defendant did not rely upon any license but on a belief that, if suit were brought on the Newkirk patents, it could be defeated. At best, there was no meeting of minds on the terms of any proposed license agreement, and therefore no enforceable agreement was made.

Had there been a meeting of minds at some conference, it would have been void under the statute of frauds because there was no writing.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.

The patents in suit are valid, the charge of infringement has been sustained, and the plaintiffs are entitled to a decree, with injunction and an accounting.